*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A25-0781**

State of Minnesota,
Respondent,

vs.

Dennis Vincent Gomez,
Appellant.

**Filed June 22, 2026
Affirmed
Bratvold, Judge**

Clay County District Court
File No. 14-CR-22-2399

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Brian J. Melton, Clay County Attorney, Cecilia Knapp, Assistant County Attorney, Moorhead, Minnesota (for respondent)

Anders J. Erickson, Johnson Erickson Criminal Defense, Minneapolis, Minnesota (for appellant)

Considered and decided by Bratvold, Presiding Judge; Worke, Judge; and Ross, Judge.

**NONPRECEDENTIAL OPINION**

**BRATVOLD**, Judge

In this direct appeal, appellant challenges the final judgment of conviction for first-degree criminal sexual conduct. Appellant argues that he is entitled to a new trial because the district court abused its discretion in admitting *Spreigl* evidence of his sexual

conduct involving another victim.[1] Appellant contends that (1) the evidence was propensity evidence and therefore inadmissible; (2) the potential for unfair prejudice to appellant from the *Spreigl* evidence outweighed the probative value of the evidence; and (3) the *Spreigl* evidence substantially affected the jury's verdict. We conclude that the district court did not abuse its discretion and therefore affirm.

## FACTS

In July 2022, respondent State of Minnesota charged appellant Dennis Vincent Gomez with first-degree criminal sexual assault involving his step-granddaughter, O.G., from 2020 to 2021, as stated in the amended complaint. *See* Minn. Stat. § 609.342, subd. 1(a) (Supp. 2019) (prohibiting sexual penetration or sexual contact with a victim under 13 years old if the defendant "is more than 36 months older" than the victim).

Before trial, the state filed a notice of its intent to introduce *Spreigl* evidence that Gomez sexually abused his granddaughter, K.G. The notice said the state sought to introduce *Spreigl* evidence to prove "motive and intent," "common scheme or plan," and "absence of mistake." Over Gomez's opposition and after a hearing, the district court granted the state's motion to admit the *Spreigl* evidence.

The district court held Gomez's jury trial during five days in November 2024. The following summarizes the evidence received during trial.

---

[1] "*Spreigl* evidence is evidence of a defendant's prior crimes, wrongs, or acts, which would otherwise be inadmissible, but which the state can seek to have admitted for the limited purpose of showing motive, intent, absence of mistake, identity, or a common scheme or plan." *State v. Asfeld*, 662 N.W.2d 534, 542 (Minn. 2003); *accord* Minn. R. Evid. 404(b)(1); *see also State v. Spreigl*, 139 N.W.2d 167, 169-70 (Minn. 1965).

O.G., who was 15 years old at the time of the trial, testified that Gomez's assault occurred in Moorhead at the house of C.G., Gomez's daughter. C.G. was O.G.'s stepmother at the time; C.G. separated from O.G.'s father before the trial. On the day that Gomez assaulted O.G., she was in C.G.'s living room with Gomez. No other adults were in the house, and O.G.'s four siblings were upstairs. Gomez was on a couch and invited O.G. to "sit on his lap to play with his phone." Gomez asked O.G. to remove her clothes. She refused and "tried to walk away." Gomez grabbed O.G. by the wrist, "pulled [her] back to the couch," and "covered [her] mouth" with his hand to prevent her from screaming. Gomez removed O.G.'s clothing and put his fingers into O.G.'s vagina.

After the assault, Gomez told O.G. "not to tell anybody" or he would "hurt" O.G. or her siblings. In response to questioning during trial, O.G. agreed that she "didn't tell anybody" about the abuse "for a long time." The first person that O.G. told about the abuse was her mother. O.G. testified that mother "kept on asking" O.G. if she had been abused because mother "found out it happened to [O.G.'s] siblings before." Mother acknowledged that C.G. told her that Gomez may have abused one of C.G.'s daughters, K.G. Mother also testified that, when she first asked O.G. whether Gomez had abused her, O.G. "[c]ompletely shut down."

A law enforcement investigator testified that mother told him O.G. "had disclosed [Gomez] rubbing her thigh with his hand" and "that she was concerned something more than that had happened." The investigator arranged a follow-up interview with O.G. at her school.

An audio recording of the interview at O.G.'s school with the investigator and a social worker was played for the jury. During the interview, O.G. stated that Gomez touched her on the thigh while they were both seated on a couch and that she "didn't like it." When asked if Gomez touched her anywhere else, O.G. said, "Yeah, sort of yeah," but did not want to say more. O.G. did not disclose that Gomez had assaulted her by digital penetration. O.G. testified that she did not disclose details of the abuse in the school interview because she "wasn't ready to talk about it."

About two months later, O.G. participated in a forensic interview conducted by a second social worker. O.G. agreed that she told the forensic interviewer "everything that had happened" to her. The second social worker testified at Gomez's trial, and a video recording of the forensic interview was played for the jury.

O.G.'s recorded statement about Gomez's sexual abuse was generally consistent with her trial testimony. O.G. also described their positions during Gomez's assault, stating that she was sitting up while Gomez lay with his back on top of her, reaching his hand behind him to cover her mouth. After the assault, Gomez left the house. C.G. returned a few minutes later, but O.G. said nothing about the assault.

The state's expert witness—a counselor to child victims of sexual abuse—testified that it was "very unusual" for a child victim of sexual abuse to say anything about the abuse immediately after it occurs. The expert testified that "[s]ecrecy and threats keep[] a person from telling" about abuse. She also testified that "there's no gain" to a child who lies about sexual abuse and that she had not encountered a child who fabricated a story of sexual abuse. The expert agreed that disclosure is "a process" and explained that a child-victim's

4

memory of abuse "comes back in pieces" and that a victim will disclose an episode of abuse in "little pieces."

The *Spreigl* evidence admitted at trial included K.G.'s testimony; a video recording of a forensic interview of K.G.; the forensic interviewer's testimony; and the law enforcement investigator's testimony.[2] Before K.G. testified, the district court read the pattern jury instruction limiting the use of *Spreigl* evidence. The district court repeated the instruction before the parties' closing arguments.

K.G. is C.G.'s daughter and O.G.'s stepsister. K.G. testified to many acts of sexual abuse by Gomez, including two instances of digital penetration, one while on a couch in the living room of C.G.'s house as well as one in her brother's bedroom. K.G. agreed that Gomez told her "not to tell anybody." In K.G.'s forensic interview, K.G. also disclosed multiple acts of sexual abuse by Gomez, including fellatio and vaginal penetration. K.G. was four or five years old at the time of Gomez's abuse and seven years old at the time of trial.

During closing arguments, the prosecuting attorney stated that Gomez was not charged with assaulting K.G. The prosecuting attorney highlighted similarities between O.G.'s and K.G.'s testimony about Gomez's sexual abuse but did not discuss the specific acts of abuse described in K.G.'s testimony.

In closing, Gomez's attorney challenged O.G.'s credibility, arguing that O.G.'s "story changed" between her forensic interview and trial testimony. He emphasized

---

[2] This was the same law enforcement investigator who testified about the investigation of the sexual abuse of O.G.

inconsistencies in O.G.'s description of where she and Gomez were seated when the assault occurred and in O.G.'s description of the assault itself. Gomez's attorney stated, "It just is not possible that [Gomez] would have been able to contort his body" during the assault in the manner O.G. described. Gomez's attorney argued that "[O.G.'s] stories have issues" and that "[K.G.'s] stories have far more or far more serious issues."

The jury found Gomez guilty. The district court imposed a sentence of 160 months in prison.

Gomez appeals.

**DECISION**

Gomez argues that the district court abused its discretion by admitting evidence of his abuse of K.G. Gomez contends that, because the evidence "was not markedly similar to O.G.'s allegation, it was only relevant as inadmissible propensity evidence." Gomez also argues that unfair prejudice from the *Spreigl* evidence outweighed its probative value. Gomez maintains that he is entitled to a new trial because the challenged evidence "had a significant effect on the jury's verdict."

Appellate courts review the admission of *Spreigl* evidence for abuse of discretion. *State v. Griffin*, 887 N.W.2d 257, 261 (Minn. 2016). An appellant challenging the admission of *Spreigl* evidence "bears the burden of showing an error occurred and any resulting prejudice." *State v. Buchan*, 993 N.W.2d 614, 626 (Minn. 2023) (quotation omitted). If an appellate court determines that the district court erroneously admitted *Spreigl* evidence, the appellate court must then determine "whether there is a reasonable

6

possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Bolte*, 530 N.W.2d 191, 198 (Minn. 1995) (quotation omitted).

"Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith." Minn. R. Evid. 404(b)(1). "It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* When *Spreigl* evidence is offered for another purpose, Minnesota Rule of Evidence 404(b)(2) provides that it is admissible if certain requirements are met. The supreme court has established a five-step test that incorporates rule 404(b)'s requirements:

> (1) the State must provide notice of its intent to use the evidence; (2) the State must clearly indicate what the evidence is being offered to prove; (3) there must be clear and convincing evidence that the defendant participated in the other act; (4) the *Spreigl* evidence must be relevant and material; and (5) the probative value of the evidence must not be outweighed by the potential prejudice.

*Buchan*, 993 N.W.2d at 626 (quotation omitted). On appeal, Gomez challenges only the district court's conclusion that the state met the requirements under the fourth and fifth steps.

### Step Four: The Spreigl *evidence was relevant and material.*

Under step four, "the *Spreigl* evidence must be relevant and material" to the state's case. *Id.* (quotation omitted). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401.

7

To demonstrate a common plan under rule 404(b), *Spreigl* evidence must "have a marked similarity in modus operandi to the charged offense." *State v. Ness*, 707 N.W.2d 676, 688 (Minn. 2006) (considering the appellant's common plan or scheme to commit criminal sexual conduct). "[T]he closer the relationship between the other acts and the charged offense, in terms of time, place, or modus operandi, the greater the relevance and probative value of the other-acts evidence and the lesser the likelihood that the evidence will be used for an improper purpose."[3] *Id.* We consider the relationship between the *Spreigl* evidence and the crime charged against Gomez, starting with modus operandi.

*Modus Operandi*

As discussed, to be admissible under the common-plan exception, *Spreigl* evidence must "have a *marked similarity* in modus operandi to the charged offense." *Ness*, 707 N.W.2d at 688 (quotation omitted). In its pretrial memorandum, the district court concluded that "the evidence of the sexual acts involving [K.G.] being offered to prove common scheme or plan is relevant and material to the State's case."[4] The district court

---

[3] Gomez argues that, to be admissible as common-plan evidence, *Spreigl* evidence must exhibit "a signature that allows the jury to infer that the same person committed two separate crimes by virtue of the unique manner in which the crimes were committed," quoting *Griffin*, 887 N.W.2d at 267 (Stras, J., concurring). We are not persuaded. First, a concurring opinion is not precedent. *See State v. Thompson*, 929 N.W.2d 21, 27 (Minn. App. 2019) (stating that language in a concurring opinion "is not the opinion of the court and, thus, not precedential"), *aff'd*, 937 N.W.2d 418 (Minn. 2020). Second, Gomez relies on *Griffin*'s "discussion of the evolution of the law on other-bad-acts evidence" that refers to "identity evidence," not common-plan evidence. 887 N.W.2d at 266-67 (Stras, J., concurring). Thus, the suggestion that other-crimes evidence must be committed in a "unique manner" is not helpful for our analysis.

[4] The state's *Spreigl* notice also identified motive, intent, and absence of mistake as other purposes. But the district court noted that "both parties neglect[ed] to address motive and

8

determined that the similarity between the sexual conduct described by K.G. and O.G. was "substantial." The district court reasoned that both girls "were left in the care of Gomez"; that Gomez "exerted a power" over both girls "by being in the position of caretaker"; "each victim was digitally penetrated" by Gomez; and Gomez directed both girls "to not disclose these acts to anyone."

Gomez concedes that "K.G.'s allegation that [Gomez] digitally penetrated K.G. while they were on the couch in the living room was markedly similar to O.G.'s allegation of digital penetration in the living room." But Gomez challenges the admissibility of evidence of the other sexual conduct involving K.G., arguing that "allegations of anal, oral, and vaginal penetration in different locations failed to exhibit a unique mode of operation." Gomez emphasizes that "there was nothing distinct that connected [K.G.'s] allegations . . . to the allegation of digital penetration in this case" and that "the district court did not make any findings that these acts were markedly similar."

Gomez relies on *State v. Clark*, in which the supreme court summarized the similarities between the *Spreigl* evidence "as described to the jury" and the charged offense: "(1) both acts involved the use of a gun to threaten the victims; (2) both acts occurred in the victims' bedrooms; and (3) both acts involved vaginal penetration or attempted vaginal penetration." 738 N.W.2d 316, 346 (Minn. 2007). The supreme court determined that "the two incidents as described to the jury do not arguably share a 'marked similarity.'" *Id.* at 347. The supreme court stated that admission of the *Spreigl* evidence

---

intent or absence of mistake" in their arguments. Accordingly, the district court declined "to do a motive and intent or absence of mistake analysis."

9

was a "close call" and concluded that the district court abused its discretion by admitting it. *Id.*; *see Ness*, 707 N.W.2d at 685 ("If the admission of evidence of other crimes or misconduct is a close call, it should be excluded.").

We reject Gomez's analogy to *Clark* because it does not address the circumstances that both O.G. and K.G. were minors under Gomez's care in a family context. Gomez's argument also seems to imply that a court should focus on the body parts involved in sexual abuse. This is not persuasive because common-plan evidence involves more than one characteristic. Here, the district court identified digital penetration as one shared characteristic between the *Spreigl* evidence and the charged offense. But the district court relied on a "set of factors," as summarized above, that were present in Gomez's multiple instances of abuse of K.G. and were also markedly similar to factors present in the charged offense. Thus, we reject Gomez's argument that "the district court did not make any findings that these acts were markedly similar."

The supreme court's analysis in *State v. Wermerskirchen* guides our analysis of modus operandi for *Spreigl* evidence of child sexual abuse within a family. 497 N.W.2d 235 (Minn. 1993). The jury convicted Wermerskirchen of second-degree criminal sexual conduct based on evidence that he had "touched" his nine-year-old daughter "in the vaginal area." *Id.* at 236-39. On appeal, Wermerskirchen challenged the admission of *Spreigl* evidence involving the victim's half-sister and two of Wermerskirchen's nieces. *Id.* at 237-39. The *Spreigl* evidence included Wermerskirchen touching "breasts and buttocks"; sexual name-calling; sexualized massages; sexualized comments accompanied by "sexual grunting sounds"; and walking in on one of the girls bathing and refusing to leave the

10

bathroom. *Id.* at 237-38. The supreme court concluded that the *Spreigl* evidence was relevant to "to disprove" Wermerskirchen's fabrication defense. *Id.* at 242. The supreme court observed that the evidence was "highly relevant in that it showed an ongoing pattern of opportunistic fondling of young girls within the family context." *Id.*

The *Spreigl* evidence involving Gomez's abuse of K.G. described acts that are more similar to the charged offense than were the *Spreigl* incidents in *Wermerskirchen*. *See id.* at 236-38; *see also State v. Kennedy*, 585 N.W.2d 385, 391 (Minn. 1998) (determining that attempted digital penetration and attempted penile penetration of a child were "nearly identical advances"). Gomez's role as caretaker of both K.G. and O.G., during which he committed sexual abuse and prevented disclosure of the abuse by threats, is analogous to the "opportunistic" nature of the abuse described in *Wermerskirchen*. 497 N.W.2d at 242. We conclude that the district court did not abuse its discretion by concluding that there was a marked similarity in modus operandi between the multiple *Spreigl* incidents that K.G. described and the charged offense.

*Place and Time*

The district court also concluded that K.G.'s allegations were "markedly similar in time and place" because "at least some of the acts occurred at the same place, the home of C.G.," and the acts were separated by, at most, five years.

Gomez does not challenge the district court's conclusion that the *Spreigl* incidents and the charged offense were close in time. Gomez contends that K.G.'s abuse occurred "in other locations" than the abuse of O.G., distinguishing between Gomez's house and K.G.'s house and various rooms within each house. The state responds that the locations

11

of abuse were the same because the sexual acts occurred "in the home where [Gomez] was babysitting the particular victim."

The district court did not abuse its discretion in evaluating the location of the *Spreigl* evidence. In *Clark*, the supreme court determined that *Spreigl* evidence of two acts, one in Minneapolis and one in St. Paul, were "relatively close in terms of place." 738 N.W.2d at 346. By analogy, different rooms within the same house would also be close in terms of place.

As for K.G.'s testimony that Gomez abused her "in his house," it is unclear from the record where Gomez lived when he abused K.G. But appellate courts will uphold the admission of *Spreigl* evidence "notwithstanding a lack of closeness in time or place if the relevance of the evidence was otherwise clear." *Kennedy*, 585 N.W.2d at 390 (quotation omitted). Because of the similarity in modus operandi, the district court did not abuse its discretion in admitting *Spreigl* evidence of Gomez's abuse of K.G. in his house without an express finding of closeness in place to the charged offense.

Because the *Spreigl* incidents involving K.G. were markedly similar to the charged offense involving O.G., the district court acted within its discretion in determining that the fourth step favored admission of the evidence.

***Step Five: The probative value of the* Spreigl *evidence was not outweighed by its potential for unfair prejudice.***

Step five requires a district court to consider whether the probative value of the *Spreigl* evidence is outweighed by its potential for prejudice. *Buchan*, 993 N.W.2d at 626. The district court must "balance the relevance of the other offenses, the risk of the evidence

being used as propensity evidence, and the State's need to strengthen weak or inadequate proof in the case." *State v. Fardan*, 773 N.W.2d 303, 319 (Minn. 2009). Although *Spreigl* evidence of other criminal conduct prejudices a defendant, the issue is whether the *Spreigl* evidence *unfairly* prejudices a defendant and, if so, whether the potential for unfair prejudice outweighs the probative value of the evidence. *Id.* at 319-20. "[U]nfair prejudice is not merely damaging evidence, even severely damaging evidence; rather, unfair prejudice is evidence that persuades by illegitimate means, giving one party an unfair advantage." *State v. Bell*, 719 N.W.2d 635, 641 (Minn. 2006) (quotation omitted).

In its pretrial order, the district court recognized that the *Spreigl* evidence created the risk of "significant prejudice" to Gomez because of the emotional impact that child sexual abuse may have on jurors and "the risk of the incident involving [K.G.] being used as propensity evidence." Even so, the district court determined that the probative value of the *Spreigl* evidence outweighed the risk of unfair prejudice for two reasons. First, the district court reasoned that the state's case was "almost entirely dependent" on O.G.'s testimony. Because there were "no other witnesses that could testify to the events and no physical evidence" because of delayed disclosure, O.G.'s credibility would be "a central issue before the fact finder" such that *Spreigl* evidence involving K.G. would have "significant probative value." Second, the district court determined that a limiting instruction would reduce the likelihood that jurors would use the *Spreigl* evidence as propensity evidence.

Gomez contends that admitting the *Spreigl* evidence to bolster O.G.'s credibility was "merely a different way of saying that the evidence was admissible as propensity

13

evidence." Gomez emphasizes that juror misuse of *Spreigl* evidence as propensity evidence is the "overarching concern" and maintains that the "lack of similarity" between K.G.'s and O.G.'s allegations increased the likelihood that the *Spreigl* evidence was used improperly as propensity evidence.

We are not persuaded that the district court abused its discretion when it concluded that the "state's need" for the *Spreigl* evidence was strong because of the lack of physical evidence or other witnesses to O.G.'s abuse. *See Fardan*, 773 N.W.2d at 319 (including "the State's need to strengthen weak or inadequate proof" as a factor in determining whether the probative value of *Spreigl* evidence outweighs its potential for unfair prejudice). The state's need for the *Spreigl* evidence increased during trial because Gomez argued that O.G. fabricated her testimony. Gomez's attorney suggested during opening statements that O.G. was coached by her mother or C.G. to accuse Gomez, that someone other than Gomez abused O.G., and that O.G. "made up the allegations against [Gomez] to help and protect her little sister [K.G.]" During cross-examination, Gomez's attorney pressed O.G. on perceived inconsistencies between her statements to law enforcement and the forensic interviewer and her trial testimony and, as summarized above, focused on those inconsistencies during closing arguments.

The supreme court has repeatedly affirmed a district court's discretion to admit *Spreigl* evidence to bolster victim credibility in criminal-sexual-conduct cases. *See Kennedy*, 585 N.W.2d at 391 (affirming the admission of *Spreigl* evidence to "refute defendant's contention that the victim's testimony was a fabrication"); *see also Wermerskirchen*, 497 N.W.2d at 241-42 (summarizing cases where *Spreigl* evidence was

14

"highly relevant" to "whether the conduct on which the charge was based actually occurred or was, as the defendants contended, a fabrication or a mistake in perception by the victim"); *cf. Ness*, 707 N.W.2d at 688 (stating that bolstering a victim's credibility is a "legitimate reason" to admit *Spreigl* evidence, but concluding that this probative value is diminished when the state's case is "particularly strong" on the issue of witness credibility). Thus, the district court's admission of *Spreigl* evidence involving K.G. was consistent with the well-established purpose of bolstering victim credibility.

Gomez's second argument—that the dissimilarity between O.G.'s and K.G.'s testimony about Gomez's abuse increased the risk that the *Spreigl* evidence would be used for an improper purpose—relies on his argument that there was no marked similarity in the sexual abuse of O.G. and K.G. Here, the marked similarity between the *Spreigl* evidence and the charged offense in time, place, and modus operandi reduced the likelihood that the jury would consider the *Spreigl* evidence for an improper purpose. *See Ness*, 707 N.W.2d at 688 (stating that similar time, place, and modus operandi between other acts and the charged offense increase relevance and probative value and decrease the likelihood of improper use of the other-acts evidence).

Finally, the risk of unfair prejudice from the *Spreigl* evidence was reduced by the district court's limiting instruction. *See, e.g., State v. Thao*, 875 N.W.2d 834, 839-40 (Minn. 2016) (recognizing that a district court's limiting instruction can reduce the probability that jurors will use *Spreigl* evidence for an improper purpose). Before K.G. testified, the district court gave the pattern jury instruction on the limited purpose of *Spreigl* evidence and repeated the instruction before closing arguments. *See* 10 *Minnesota*

15

*Practice*, CRIMJIG 2.03 (2023); *see also State v. Broulik*, 606 N.W.2d 64, 68-71 (Minn. 2000) (approving the pattern jury instruction on the limited purpose of *Spreigl* evidence).[5]

As the district court did, we recognize the prejudicial nature of the *Spreigl* evidence against Gomez. Still, we conclude that the district court acted within its discretion in determining that the risk of unfair prejudice did not outweigh the probative value of the evidence.

In sum, because the *Spreigl* evidence of Gomez's abuse of K.G. was relevant and material, and because its probative value was not outweighed by the risk of unfair prejudice, the district court did not abuse its discretion by admitting the evidence and we need not consider whether it significantly affected the verdict.[6]

**Affirmed.**

---

[5] The district court asked the parties if they had any issues with the limiting instruction both before K.G.'s testimony and before closing arguments. Gomez's attorney replied, "No," both times. On appeal, Gomez argues for the first time that the district court's limiting instruction on the *Spreigl* evidence was ineffective because it "did not inform jurors that the other-crime evidence was offered solely to show a common scheme or plan." Because Gomez did not argue plain error on appeal or challenge the language of the limiting instruction in district court, we need not consider this argument. *See Roby v. State*, 547 N.W.2d 354, 357 (Minn. 1996) (stating that appellate courts "generally will not decide issues which were not raised before the district court").

[6] We acknowledge Gomez's argument within the prejudicial-error issue about the scope of evidence received involving Gomez's abuse of K.G. Gomez argues that the district court admitted excessive *Spreigl* evidence that "permeated the State's entire case" and involved allegations of multiple acts of sexual abuse. As discussed above, we need not reach the prejudicial-error issue. But we are mindful that the supreme court has stated that "the district court should take great care in limiting . . . *Spreigl* testimony so as to minimize the potential for unfair prejudice." *State v. Washington*, 693 N.W.2d 195, 204 (Minn. 2005).

A defendant's "failure to object to *Spreigl* testimony constitutes waiver of the right to appeal unless (1) there was error, (2) the error was plain, and (3) the error affects the defendant's substantial rights." *Id.* Here, Gomez's attorney did not object to the scope of *Spreigl* evidence during trial. And as discussed above, the district court did not abuse its discretion in admitting the *Spreigl* evidence; therefore, no plain error occurred.